J-S45013-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WALTER W. HALL | : | |
| | : | |
| Appellant | : | No. 857 MDA 2023 |

Appeal from the Judgment of Sentence Entered April 26, 2023
In the Court of Common Pleas of Montour County Criminal Division at
No(s): CP-47-CR-0000161-2021

BEFORE: BOWES, J., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BOWES, J.: **FILED: JANUARY 25, 2024**

Walter W. Hall appeals from the judgment of sentence of six to twelve months of incarceration imposed after a jury convicted him of terroristic threats. We affirm.

We glean the following factual history from the trial transcript. Appellant and Pamela Tyler dated for several months during the winter of 2003-04. They stayed in touch in the ensuing years and rekindled their relationship in January 2021. The following month, Ms. Tyler moved into Appellant's residence, where he lived with his fourteen-year-old daughter, to assist with Appellant's struggling finances. While the couple had been having arguments

_____

[*] Former Justice specially assigned to the Superior Court.

from time to time, tensions dramatically escalated on Labor Day weekend of 2021.

According to Ms. Tyler, the troubles began on Friday morning when Appellant complained about being emasculated by Ms. Tyler's making him the butt of her jokes about being old and "a kept man," and told her to get out. N.T. Trial, 2/10/23, at 25. She went out shopping, and Appellant bombarded her with phone calls and text messages. Ms. Tyler procured some items Appellant requested, returned to the home, and stayed in the bedroom the rest of the night. The next day the couple and Appellant's daughter went to an auction, were Appellant berated Ms. Tyler for overpaying for an item. Ms. Tyler again opted to spend the evening by herself in the bedroom.

The arguing began again on Sunday morning, with Appellant complaining that Ms. Tyler made everything about herself. He spent the early afternoon going back to the bedroom every few minutes to engage with her. Ms. Tyler stayed in bed and watched a movie until approximately 3:30 p.m. when "the next blow-up happened" and Appellant then told her to "get the F out of his house." *Id*. at 30. Ms. Tyler stated that she would leave and began packing her belongings. During the packing, Appellant resumed his circuit in and out of the bedroom, postulating on matters ranging from why she thought that he was a monster, to how much he loved her, to how stupid she was. *Id*. at 31. At one point, Appellant brought his daughter, who had been watching television in her own room all the while, back to the room and told her that

she did not have to be nice to Ms. Tyler, whom he called "that stupid bitch." *Id*. at 32.

Having finished gathering her belongings, Ms. Tyler began contemplating where she would go, as she had sold her home when she moved in with Appellant. Appellant then cornered her in the back of the bedroom, got in her face nose-to-nose, and told her that she had better not "drag his name through the mud" or "cause him any problems" after she left, and threatened to hit her. *Id*. at 33-34. Appellant then exited the bedroom and returned with one arm behind his back, again blocking her into the corner and inquiring whether she was going to "have the cops here" or otherwise "cause [him] any problems" when she left. *Id*. at 35. According to Ms. Tyler, after she informed Appellant that she would not and simply wanted to take her belongings and leave, he pulled out a butcher knife, held it between them, and told her that if she did anything, "he would hunt [her] down and take [her] out no matter where [she] went." *Id*.

Terrified, with no place to go, Ms. Tyler "shut down" and "crawled back into bed, covered up." *Id*. at 36-37. Appellant later returned while she was in bed and threatened to have his daughter "punch [her] in the face and knock [her] down and kick [her] in the guts and kick [her] teeth in," indicating that he would inform police that Ms. Tyler initiated it by slapping the child in the face. *Id*. at 37. Concluding that Appellant was "going to do whatever it takes

to hurt [her]," Ms. Tyler packed some necessary items and fled at approximately 1:30 A.M. on Monday, September 6, 2021.

Ms. Tyler spent Labor Day hiding in her daughter's basement. The following day, she got in touch with a domestic violence shelter and filed a Protection from Abuse ("PFA") petition. On Wednesday, she obtained a temporary PFA order and filed a report with the police, which resulted in Appellant's arrest on September 9, 2021. While in a holding cell, Appellant admitted to Trooper Jennifer Bowers that he had approached Ms. Tyler while she was packing and "told her that he would stomp her," but denied wielding a butcher knife at any point. *Id*. at 54-55.

Appellant was charged with terroristic threats, simple assault, and summary harassment. He entered a guilty plea to terroristic threats but was granted leave to withdraw it prior to sentencing. With new counsel, Appellant proceeded to a jury trial on February 20, 2023. In addition to the above testimony provided by Ms. Tyler and Trooper Bowers, the jury heard from Appellant and his daughter. The latter testified that Appellant and Ms. Tyler communicated throughout the day in question. *Id*. at 96. While she could not understand most of what they said, she was able to hear the substance of the louder arguments. Likewise, she corroborated that Appellant was in and out of the bedroom all day but denied hearing any threats or seeing a knife. *Id*.

For his part, Appellant confirmed that the tensions began on Friday of Labor Day weekend with his bemoaning Ms. Tyler's hurtful joking. He indicated that he avoided further argument and she left in her car. Appellant's version of Saturday's events at the auction omitted any indication that he had berated her for her failure to haggle, but included details of a prank Ms. Tyler pulled on his daughter, not for the first time, of pretending to unlock the car and making fun of the child in public when she unsuccessfully yanked the door handle. *Id*. at 67.

Appellant claimed that he was awakened on Sunday morning by Ms. Tyler "slamming things around" in the bedroom and hinting that she was preparing to leave. *Id*. at 68. He told her that "it's probably time for you to go anyway, so just get your stuff and leave." *Id*. In Appellant's version of events, Ms. Tyler immediately stopped packing and sat on the bed, and when he went back and forth throughout the day, it was to encourage her to continue packing despite her expressed disinclination to leave. *Id*. at 68-70. Any time these discussions started to become arguments, Appellant simply walked away. *Id*. at 70. Appellant maintained that he loved Ms. Tyler and that he recognized that she had no place to go because she had sold her house to help him financially, but he felt he had no choice but to ask her to leave

because of the way she interacted with him and his daughter after she had started using high-potency THC in the last month.[1] *Id*. at 69, 75.

Appellant denied threatening Ms. Tyler verbally or with a knife. *Id*. at 74. Rather, he indicated that Ms. Tyler was the one who made the threats, telling him that she would "destroy" him if he made her leave by telling people whatever she had to say to have Appellant put in jail, and that "it won't take much to get them to believe [her]" even though he had done nothing. *Id*. at 77-78. Appellant repeated to the jury time and time again that he held no malice or ill will towards Ms. Tyler that would have prompted him to threaten her. Instead, Appellant insisted that he "felt bad for" her. *Id*. at 71, 74, 75, 78, 82.

During closing arguments, Appellant attacked Ms. Tyler's credibility largely on the basis that she "had absolutely every opportunity to leave that day on [Sunday,] September 5." *Id*. at 103. He maintained that she did not do so because she was not afraid of him, and instead fabricated false accusations to punish Appellant for making her leave. *Id*. The Commonwealth advocated that the defense had "thr[own] everything they could against the wall hoping something would stick." *Id*. at 106. It countered the defense's reliance upon Ms. Tyler's continued presence in the

---

[1] The Commonwealth objected to Appellant's initial reference to Ms. Tyler's THC use and the comment was stricken, but later reiterations of the claim were not challenged.

home after Appellant's threats by characterizing it as "victim shaming," asserting that "[a] domestic violence victim is not required to run away," and noting that she explained how days of encouragement by her daughter and the domestic violence shelter convinced her to report the incident. *Id*. The prosecutor further ridiculed the suggestion that Ms. Tyler's alleged THC use caused her to become aggressive toward Appellant, observing "in my experience dealing with individuals using marijuana, it does not result in them becoming angry, combative and argumentative." *Id*. at 108. Notably, Appellant raised no objections to the Commonwealth's closing remarks.

After deliberating for several hours, the jury found Appellant guilty of terroristic threats but declined to find him guilty of simple assault or possession of a deadly weapon in connection with terroristic threats.[2] On April 26, 2023, Appellant was sentenced as indicated above, with provisions for immediate work release and automatic parole at the conclusion of his minimum sentence.

Appellant filed a timely post-sentence motion challenging the sufficiency and weight of the evidence. For both claims, Appellant asserted that he was entitled to relief based upon the discrepancies between Ms. Tyler's testimony on the one hand and that of him and his daughter on the other. *See* Post-Sentence Motion, 5/5/23, at ¶¶ 5-6. Appellant further asserted that he was

---

[2] At the conclusion of the trial, the court separately found Appellant guilty of summary harassment and imposed a fine.

entitled to a judgment of acquittal based upon the prosecution's closing remarks about domestic violence victims, claiming that it was "speculation and had the jury take into consideration facts not in evidence." *Id*. at ¶ 5(d).

The trial court denied the post-sentence motion after a hearing, and Appellant filed a timely notice of appeal. The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement, and he promptly complied. Appellant presents the following questions for our review:

> 1.     Whether the evidence was insufficient to convict [Appellant] of terroristic threats and establish that victim was in fear of serious bodily injury or was threatened?
>
> 2.     Whether the verdict was against the weight of evidence when considering all testimony?
>
> 3.     Whether the prosecutor's statements in closing arguments regarding domestic violence were prejudicial to defendant?

Appellant's brief at 4.

Appellant first challenges the sufficiency of the evidence to sustain his terroristic threats conviction. The following principles apply to consideration of this claim:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth

- 8 -

may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Haahs*, 289 A.3d 100, 104 n.2 (Pa.Super. 2022) (cleaned up).

Appellant was convicted of terroristic threats pursuant to the following statute: "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another[.]" 18 Pa.C.S. § 2706(a). We have explained that "the harm sought to be prevented by the statute is the psychological distress that follows from an invasion of another's sense of personal security." *Commonwealth v. Kline*, 201 A.3d 1288, 1290 (Pa.Super. 2019) (cleaned up).

The defendant need not articulate a specific crime of violence "where the type of crime may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement." *Commonwealth v. Martinez*, 153 A.3d 1025, 1028 (Pa.Super. 2016) (cleaned up). Further, a terroristic threats conviction does not require proof that the defendant actually intended to commit the violence, but rather an intent to terrorize a target individual. *See Kline*, *supra* at 1290. Moreover, "neither the ability to carry out the threat nor a belief by the person threatened

that it will be carried out is an essential element of the crime." *Id*. (cleaned up).

While the statute "is not meant to penalize mere spur-of-the-moment threats which result from anger," this Court has acknowledged that "being angry does not render a person incapable of forming the intent to terrorize." *Commonwealth v. Reynolds*, 835 A.2d 720, 730 (Pa.Super. 2003) (cleaned up). "This Court must consider the totality of circumstances to determine whether the threat was a result of a heated verbal exchange or confrontation." *Id*. (cleaned up).

Here, Appellant contends that the totality of the circumstances is such that "any words construed as a threat would have been in the heat of the moment." Appellant's brief at 10. The specific circumstances upon which he relies are: (1) "the arguing over the course of the weekend," (2) "the inconsistencies in [Ms. Tyler]'s testimony," (3) "Appellant's denial of intent to scare or threaten [her]," and (4) Ms. Tyler's "remaining in the home despite having the ability to leave." *Id*. Appellant asserts that his conviction is thus supported by insufficient evidence and should be vacated. *Id*.

We are wholly unpersuaded. First, construing Ms. Tyler's failure to flee at the first opportunity as evidence that she was not terrorized would be to view it in the light most favorable to Appellant, not the Commonwealth as verdict winner. Second, it was for the jury, not this Court, to resolve any inconsistencies in her testimony. Third, the jury was free to accept her

testimony that she was in essence paralyzed with fear and had to sort out where she could go. *See* N.T. Trial, 2/10/23, at 36-37. It was also free to reject Appellant's self-serving denials and accept Ms. Tyler's statements that Appellant made not just a single threat in the heat of an argument, but multiple threats of violence over the course of many hours in an escalation of his complaints of feeling emasculated.

Finally, the jury heard from Ms. Tyler that Appellant both stated that "he would hunt [her] down and take [her] out no matter where [she] went," and that he would instruct his daughter to strike her in the face, guts, and teeth, and from Trooper Bowers that Appellant admitted to threatening to "stomp" Ms. Tyler. *Id*. at 35, 37, 54-55. This evidence was sufficient to allow the jury to conclude that Appellant had threatened multiple crimes of violence, and that he did so not merely in the heat of the moment, but in order to terrorize Ms. Tyler. Accordingly, Appellant's sufficiency challenge must fail.

Next, Appellant assails his conviction as being against the weight of the evidence. The following law applies to our consideration of that claim:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a

- 11 -

review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Arias*, 286 A.3d 341, 352 (Pa.Super. 2022) (cleaned up). Accordingly, our task is to determine whether the trial court, in ruling on Appellant's weight challenge, "abused its discretion by reaching a manifestly unreasonable judgment, misapplying the law, or basing its decision on partiality, prejudice, bias, or ill-will." *Commonwealth v. Clay*, 64 A.3d 1049, 1056 (Pa. 2013) (cleaned up).

In asserting his weight claim, Appellant merely highlights the evidence favorable to him, posits that the verdict was contrary to it, and, in essence, suggests that we weigh the evidence differently. *See* Appellant's brief at 11-12. That we will not do. *See Clay*, *supra* at 1056 (reversing this Court's grant of a new trial based upon a weight challenge on the basis that the "Superior Court stepped into the shoes of the trial judge and revisited the underlying question of whether the verdict was against the weight of the evidence, an analysis that is not appropriate under the appellate standard of review").

In rejecting Appellant's challenge, the trial court explained that the split verdict plainly evinced that it carefully considered all the evidence and credited Ms. Tyler in some but not all respects. Appellant provides no basis for us to conclude that this ruling was a product of partiality, bias, ill-will, misapplication of the law, or a manifestly unreasonable judgment. As such,

we have no cause to disturb the trial court's exercise of discretion in denying Appellant the requested relief.

Appellant's final claim is that he was prejudiced by the prosecution's remarks during closing arguments. Specifically, Appellant asserts that the prosecutor improperly commented "on facts not in evidence when he made the statement regarding domestic violence victims," and "on the effects of marijuana on people when testimony was stricken and there was no expert presented by either defense or prosecution as to the effects of marijuana on people." Appellant's brief at 14. He then baldly states that the statements were "inflammatory and prejudicial to Appellant" and a new trial should be granted. *Id*.

We begin by observing that our review of a claim that prosecutorial misconduct warrants a new trial "is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error." *Commonwealth v. Hernandez*, 230 A.3d 480, 490 (Pa.Super. 2020) (cleaned up). "Even if the prosecutor's arguments are improper, they generally will not form the basis for a new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict." *Id*. at 490 (cleaned up). "A trial court may remove taint through curative instructions." *Commonwealth v. Caldwell*, 117 A.3d 763, 774 (Pa.Super. 2015) (*en banc*). "Courts must consider all surrounding

circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required." ***Id***. (cleaned up).

The effects of any improper comments "depends upon the atmosphere of the trial, and the proper action to be taken is within the discretion of the trial court." ***Commonwealth v. Clancy***, 192 A.3d 44, 63 (Pa. 2018) (cleaned up). "Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." ***Hernandez***, ***supra*** at 490 (cleaned up). As our Supreme Court has explained: "If the defendant thinks the prosecutor has done something objectionable, he may object, the trial court rules, and the ruling—not the underlying conduct—is what is reviewed on appeal. Where . . . no objection was raised, there is no claim of 'prosecutorial misconduct' as such available." ***Commonwealth v. Cox***, 983 A.2d 666, 685 (Pa. 2009) (cleaned up).

Here, Appellant made no objection to the prosecution's closing remarks, nor any request for a mistrial or other remedy. As such, the trial court did not have the opportunity to make a ruling as to whether the comments were improper and what remedy, if any, was required. Consequently, we have no exercise of discretion to review. In other words, Appellant's prosecutorial misconduct claim was waived for purposes of this appeal. ***See Commonwealth v. Brown***, 134 A.3d 1097, 1107–08 (Pa.Super. 2016) ("Appellant failed to preserve this claim for appeal as he did not object to the prosecutor's statement at trial and raises this argument for the first time on

appeal. *See* Pa.R.A.P. 302(a).").  Therefore, Appellant's final issue entitles him to no relief.[3]

Judgment of sentence affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/25/2024

---

[3] The trial court in its Pa.R.A.P. 1925(a) opinion indicated that the prosecution's remarks were supported by the evidence and made in fair response to the defense's closing arguments.  *See* Trial Court Opinion, 7/25/23, at 5-6.  As recounted hereinabove, the jury heard evidence that Ms. Tyler sought assistance to cope with domestic violence when she felt able to do so, and that Appellant blamed the conflict upon her alleged use of THC. *See* N.T. Trial, 2/10/23, at 36-39, 75.  These facts in evidence were fairly referenced by the prosecution in response to the defense's attacks upon Ms. Tyler's credibility.  *Accord Commonwealth v. Riggle*, 119 A.3d 1058, 1068 (Pa.Super. 2015) (holding prosecutor's remark that the victim was "credible and telling the truth" was a fair response to the defense's contentions that the victim "was a juvenile delinquent, had lied about other events, and also lied about the sexual assaults at issue").  Therefore, we discern no basis to disagree with the trial court's assessment even if Appellant had preserved the issue.